**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| KIMBERLY-CLARK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. __3:18cv02_____ |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| MCKESSON MEDICAL-SURGICAL INC.; | ) | **JURY TRIAL DEMAND** |
| VICTOR BAKKAR; CLARE MEDICAL, | ) | |
| INC.; and HERBERT A. TOMS III, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Kimberly-Clark Corporation ("Kimberly-Clark"), by its undersigned counsel, for its complaint against Defendants McKesson Medical-Surgical Inc. ("McKesson"), Victor Bakkar ("Bakkar"), Clare Medical, Inc. ("Clare Medical"), and Herbert A. Toms III ("Toms"), alleges as follows:

## NATURE OF THE ACTION

1.      Kimberly-Clark is one of the country's leading manufacturers of personal care products. This case concerns one of Kimberly-Clark's most well-known and well-loved brands, Huggies® diapers and training pants. For almost four decades, families, caregivers, and healthcare professionals have turned to Huggies® diapers and training pants for their superior quality, comfort, and protection. Huggies® is the fastest growing diaper brand in the country's hospitals, and Kimberly-Clark partners with hospitals and nurses across the nation to ensure they have the products they need to deliver the best quality care for their infant patients.

2.      As part of its commitment to serving the needs of healthcare providers, Kimberly-Clark offers substantial discounts off list prices to certain healthcare providers who purchase Huggies® diapers and training pants for their own use. Kimberly-Clark makes these discounts,

known as acute-care hospital pricing, available to healthcare providers who need diapers for providing patient care, and not for their resale value.

3.      Kimberly-Clark sells Huggies® diapers and training pants through its authorized distributor, McKesson.  McKesson advertises itself as a distributor of medical products to the alternate site market, serving customers that are medical practices, surgery centers, and community health centers.  Under its distributor arrangement, McKesson promised Kimberly-Clark that it would only sell Huggies® diapers and training pants to end users that were, in fact, healthcare providers who were using the diapers for direct patient care ("own use").  As a manufacturer, Kimberly-Clark relies exclusively on authorized distributors like McKesson to ensure that its products are being sold to the right customers.

4.      This case involves McKesson's abuse of its role as a Kimberly-Clark distributor and its failure to abide by its promises to Kimberly-Clark, which have caused more than $2.2 million in damages to Kimberly-Clark.  Motivated by corporate greed and enabled by its careless, *laissez faire* sales culture, McKesson attempted to drive up its sales figures, and corresponding profits, by selling millions of dollars' worth of Huggies® diapers and training pants to Clare Medical, a customer that was not a healthcare provider at all.  By engaging in these unauthorized sales, McKesson pocketed more than $2.2 million for its own benefit, at Kimberly-Clark's expense.

5.      McKesson had every reason to know—and did in fact know—that all of its sales to Clare Medical were improper.  Although McKesson promised Kimberly-Clark that it would only sell Huggies® diapers and training pants to healthcare providers that would use the products for their own use (and not for resale), McKesson knew Clare Medical was not a healthcare provider, but actually a reseller of medical supplies that was buying up huge quantities of

Huggies® diapers and training pants at deeply discounted prices normally available only to hospitals and healthcare providers. By making these sales, McKesson enabled Clare Medical to reap hefty profits by pawning off Huggies® diapers and training pants to its unknowing consumers. McKesson had every incentive to participate in this scheme because it also directly profited off the massive volume of improper and unauthorized sales that it was making to Clare Medical, and Clare Medical would not have purchased in the volumes that it did had McKesson not been an active participant in the scheme.

6. Even though McKesson knew that it was improper to sell Huggies® diapers and training pants to Clare Medical, and even after Kimberly-Clark notified McKesson beginning in July 2016 that its sales to Clare Medical were improper, McKesson continued to sell to Clare Medical in vast quantities, earning a tidy profit with each additional sale. McKesson further covered its tracks by taking immediate rebates from Kimberly-Clark to cover its own acquisition costs for the products that it sold to Clare Medical at deep discounts, and pocketed those rebates before Kimberly-Clark had an opportunity to review their legitimacy. And when Kimberly-Clark did protest, McKesson said that it was too late, and that it was keeping the ill-gained profits for itself.

7. All said and done, McKesson sold 78,540 cases of Huggies® diapers and training pants to Clare Medical over a six-month period from May to November 2016. These sales to Clare Medical were well above the needs of any single, legitimate purchaser. Indeed, McKesson's sales to Clare Medical totaled half of what *all* of the 1,300-plus hospitals in Kimberly-Clark's customer network purchased, *combined*. These Clare Medical sales were entirely unauthorized, contrary to Kimberly-Clark's distributor policies, and should have never happened. As a result of Defendants' unlawful scheme, Kimberly-Clark was shortchanged to the

tune of over $2.2 million, while McKesson and Clare Medical both profited handsomely from these improper sales. Kimberly-Clark now brings this lawsuit to recover the losses it incurred as a result of Defendants' fraudulent distribution scheme.

## PARTIES

8.     Plaintiff Kimberly-Clark is a corporation organized and existing under the laws of Delaware. Kimberly-Clark maintains its principal place of business in Irving, Texas.

9.     Defendant McKesson is a corporation organized and existing under the laws of Virginia. Upon information and belief, McKesson maintains its principal place of business in Richmond, Virginia.

10.     Defendant Victor Bakkar is an individual. Upon information and belief, Bakkar is a resident of Virginia Beach, Virginia, and is currently employed by McKesson as an Account Manager. Upon information and belief, Bakkar is the Account Manager responsible for overseeing McKesson's sales to Clare Medical.

11.     Defendant Clare Medical is a corporation organized and existing under the laws of Virginia. Upon information and belief, Clare Medical maintains its principal place of business in Newport News, Virginia.

12.     Defendant Herbert A. Toms III is an individual. Upon information and belief, Toms was a resident of Williamsburg, Virginia during the time periods relevant to this Complaint, and is currently a resident of Weston, Florida. Upon information and belief, Toms currently serves as President of Clare Medical.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship. There is complete diversity of citizenship between Plaintiff Kimberly-

Clark and Defendants McKesson, Bakkar, Clare Medical, and Toms. The amount in controversy exceeds $75,000, exclusive of interest and costs.

14. This Court has personal jurisdiction over Defendants. Upon information and belief, Defendants McKesson, Bakkar, and Clare Medical are subject to this Court's general personal jurisdiction. Defendants McKesson and Clare Medical are incorporated in Virginia and maintain their principal places of business within Virginia. Defendant Bakkar was at all relevant times domiciled in Virginia. Defendant Toms is subject to this Court's personal jurisdiction because Toms purposefully availed himself of the privileges and protections of Virginia by conducting business in Virginia, entering into contracts in Virginia, and committing tortious acts in Virginia while domiciled in Virginia. All of Kimberly-Clark's claims arise out of the activities that Toms carried out in Virginia.

15. Venue is proper in this Court pursuant 28 U.S.C. § 1391. Upon information and belief, Defendants McKesson, Bakkar, and Clare Medical are residents of this judicial district. Additionally, venue is proper in this Court because a substantial part of the events or omissions giving rise to Kimberly-Clark's claims occurred in this judicial district.

**FACTUAL ALLEGATIONS**

**A. McKesson Promises Kimberly-Clark That It Will Sell Huggies® Diapers And Training Pants To Healthcare Providers For Their Own Use Only.**

16. Kimberly-Clark is a leading manufacturer of personal care products, including some of America's most well-known household brands. One of Kimberly-Clark's most widely-recognized brands is Huggies® diapers and training pants.

17. To provide its Huggies® products to hospitals and healthcare providers for use on their patients, Kimberly-Clark secures special preferred pricing for approved healthcare providers who purchase Huggies® diapers and training pants for their own use in providing

patient care.  This preferred pricing, known as acute-care hospital pricing, provides substantial

discounts of up to 89 to 94% off the list prices that are normally available to purchasers.  Access

to these prices is conditioned on the healthcare providers' use of the diapers and training pants on

patients at their own facilities.  Kimberly-Clark strictly forbids resale of the products.

18.     As the manufacturer of Huggies® diapers and training pants, Kimberly-Clark

does not generally sell its products directly to hospitals and healthcare providers.  Rather,

Kimberly-Clark partners with authorized distributors who are responsible for managing,

overseeing, and facilitating the sales and deliveries of Kimberly-Clark products to hospitals and

other healthcare providers throughout the country.

19.     McKesson is one such distributor.  McKesson markets itself as a distributor of

medical products for healthcare providers that deliver medical services to patients in the alternate

site market, including health systems, surgery centers, and physician's offices.[1]  By marketing

itself in this way, McKesson represents that it distributes products to healthcare providers who

use the purchased products on their own patients, rather than offering them for resale:[2]

---

[1]  *About McKesson Medical-Surgical*, McKesson, http://www.mckesson.com/about-
    mckesson/our-company/businesses/mckesson-medical-surgical/ (last visited Jan. 2, 2018).

[2]  *Medical Supplies and Equipment*, McKesson, http://www.mckesson.com/about-
    mckesson/our-company/businesses/mckesson-medical-surgical/medical-supplies-and-
    equipment/ (last visited Jan. 2, 2018).



20.     Based on McKesson's representations that it was a distributor to healthcare providers who were purchasing products for their own patients' use, Kimberly-Clark partnered with McKesson to sell Huggies® diapers and training pants to healthcare providers who would use those diapers and training pants in the course of delivering patient care.  McKesson never informed Kimberly-Clark that McKesson would be selling Huggies® diapers and training pants to resellers who would turn around and resell the diapers at a significant profit to themselves (and loss to Kimberly Clark).

21.     Kimberly-Clark formalized the policies governing its distributor arrangement with McKesson in its Terms and Conditions for Healthcare Distributors manual ("Terms and Conditions").  McKesson, like all of Kimberly-Clark's authorized distributors, agreed to these Terms and Conditions and was required to comply with them.  Kimberly-Clark provided the

Terms and Conditions to McKesson, and McKesson could access the Terms and Conditions at any time through Kimberly-Clark's online Customer Portal.

22.    In addition, each page of the Customer Portal contained a legal notice reminding the user that use of the Customer Portal constituted acceptance of the Terms and Conditions. McKesson voluntarily registered for the Customer Portal and regularly accessed the Customer Portal in connection with its sale of Kimberly-Clark products.

23.    Section XV of the Terms and Conditions set forth Kimberly-Clark's Diaper Resale Policy for distributors, which McKesson agreed to follow for its sale of Huggies® diapers and training pants.  Under the Diaper Resale Policy, McKesson was only allowed to sell diapers to hospitals and other health care providers that would be using the diapers on their own patients—and not to individuals who would turn around and simply resell the products:

> **XVII.  Diaper Resale Policy**
> All infant and child Huggies* Diapers, Huggies* Pull-Ups training pants, and GoodNites* underpants **<u>are restricted for sale to hospitals and other health care providers using the product for direct patient care</u>** (e.g. medical clinic, medical laboratories, physician offices, ambulatory surgery centers, Health Maintenance Organizations, Preferred Provider Organizations, etc.) and custom tray manufacturers.  **<u>The above products should not be sold to any retailer or wholesaler for resale in the retail consumer market.</u>**

(emphases added).

24.    Thus, consistent with McKesson's representations about its healthcare provider customers, Kimberly-Clark's Diaper Resale Policy made it amply clear that Kimberly-Clark's distributors were only permitted to sell Huggies® diaper and training pant products to "hospitals and other health care providers using the product for direct patient care."  The Diaper Resale Policy strictly forbade distributors from selling Huggies® diaper products to "any retailer or wholesaler for resale in the retail consumer market."

**B. McKesson Sells 78,540 Cases Of Huggies® Diapers And Training Pants, Totaling $2.9 Million, To Clare Medical, Which Equaled Half Of What All Legitimate Hospital Customers Purchased, *Combined*, During That Same Period.**

25.     It is well known in the medical supply industry that McKesson has developed a corporate culture with a singular focus on maximizing its bottom line.  With this singular focus on profits, McKesson has a pattern of shirking its distributor responsibilities, including its responsibility to implement corporate controls to prevent the diversion of its sales to improper customers who purchase the products for illegitimate purposes.

26.     This case presents just one example where McKesson has engaged in a pattern of selling products (here, Huggies® diapers and training pants) to an improper customer, for an improper purpose—all to benefit its own bottom line, and to the detriment of the manufacturer.

27.     Desiring to increase its sales and profits, McKesson did not follow Kimberly-Clark's Diaper Resale Policy.  In just six months, from May to November 2016, McKesson sold 78,540 cases of Huggies® diapers and training pants to Clare Medical.  Clare Medical's unreasonably high purchase volumes were far above what any single legitimate hospital or healthcare provider could possibly use for their own patient needs.  In fact, Clare Medical single-handedly purchased as many diapers and training pants as half of the *combined* diaper purchases of *all* of Kimberly-Clark's 1,300-plus hospital customers during that same period.  Clare Medical's purchase volumes could only be attributed to a reseller, and McKesson knew it.

28.     Indeed, Clare Medical is not a hospital, clinic, or healthcare provider.  Clare Medical has no patients and does not employ doctors, nurses, or medical staff.  Instead, Clare Medical is a reseller of medical supplies, whose business is to purchase inventory at low prices, and resell that inventory at a higher price for a profit.  McKesson therefore was not allowed to sell Huggies® diapers and training pants to a reseller like Clare Medical.

29.     The mammoth volume of Clare Medical's purchases is not the only evidence that McKesson knew it was making unauthorized sales to Clare Medical. McKesson also shipped these 78,540 cases of Huggies® diapers and training pants directly to the Clare Medical warehouse, which is located just seventy miles away from McKesson's corporate headquarters.

30.     McKesson also knew (or, at minimum, should have known) that the President of Clare Medical, Herbert A. Toms III, also runs several other businesses out of the same warehouse where McKesson was delivering truckloads of Huggies® diapers and training pants to Clare Medical. These businesses include MDR Specialty Distribution Corporation, Excelera Corporation, Warwick Acute Healthcare LLC, Venuity Corporation, and Venuity Healthcare Corporation. None of these businesses are healthcare providers. To the contrary, upon information and belief, Toms' other businesses are, like Clare Medical, resellers of medical supplies and equipment, and Clare Medical uses these other businesses to resell the Huggies® diapers and training pants that it purchased from McKesson.

31.     For example, Venuity Corporation is a reseller of medical supplies and equipment that is housed at the same address as Clare Medical. On its website, http://www.venuityhealthcare.com, Venuity Corporation advertises itself as a "low operating cost distributor" offering a "wide variety of products available to suit all medical needs." The "Products" page of Venuity Corporation's website lists "Kimberly Clark" as one of the available product lines that the company sells.

32.     Venuity Corporation also maintains an eBay storefront, "spendsmartstore," which sells Huggies® diapers and training pants at impossibly low prices to customers through the Internet:





33.     Upon information and belief, Venuity Corporation also sells to individual

consumers through an Amazon storefront, "SpendSmart," which offers the same price points for

Huggies® diapers and training pants that are less than half the price available from legitimate

retailers selling those same products:



34.     Through these websites, Venuity Corporation sells Huggies® diapers and training

pants at prices that are more than 60% lower than what other legitimate retailers are able to offer.

For example, whereas certain Huggies® 72-count products retail for more than $65, Venuity

Corporation is able to sell those same products for just $25.  Venuity Corporation's prices would

not be economically viable unless Venuity Corporation accessed these products at Kimberly-

Clark's acute-care hospital prices (which are 89 to 94% lower than normal list prices), even

though Kimberly-Clark has only approved such pricing for sales made to hospitals and

healthcare providers' own use.

35.     Venuity Corporation's "SpendSmart" Amazon store webpage further claims that

it is able to offer customers "exceptional savings by purchasing unclaimed freight from air/land

transport companies, and overstock merchandise from manufacturers and distributors."[3]  This is

---

[3]  *See* SpendSmart Seller Profile, Amazon.com, https://www.amazon.com/sp?_encoding=
UTF8&asin=B014TT4X32&isAmazonFulfilled=0&isCBA=&marketplaceID=ATVPDKIKX
0DER&orderID=&seller=AMBW826DXHOF0&tab=&vasStoreID= (last visited Jan. 2,
2018).

not true; these so-called "exceptional savings" are only possible due to the wrongful pricing scheme that Clare Medical, Toms, and McKesson have perpetrated.

36. That McKesson knew about the nature of Clare Medical's business is further confirmed by McKesson's own account manager assigned to the Clare Medical account, Victor Bakkar. One of McKesson's most successful sales representatives, Bakkar prides himself in maintaining a "hands-on" and customer-focused sales philosophy built on customer trust. One of Bakkar's customers has praised Bakkar for his "honesty and sincerity," describing Bakkar's sales practices as follows:

> Victor [Bakkar] knows the decision-makers and all who will be involved in a purchase. . . . He probes and understands the customer's business prior to engaging manufacturer reps, so when we walk in the door, we both have an understanding of customer needs and the opportunity.[4]

37. Bakkar's sales to Clare Medical were no different. Over the course of several years, Bakkar developed a close working relationship with Clare Medical. Bakkar surely must have known that one of his biggest customers (if not the biggest) was not a healthcare provider, but rather a reseller of medical supplies. Bakkar was therefore well aware of the nature of Clare Medical's business, as well as the above-described pricing scheme which gave both himself and his company (McKesson) inflated commissions and profits from the illegitimate sales to Clare Medical.

38. Moreover, Bakkar made affirmative representations to Kimberly-Clark about the nature of Clare Medical's business. On or around October 31 and November 2, 2016, Bakkar told a Kimberly-Clark representative that he was familiar with Clare Medical and that Clare Medical was the purchaser for a rapidly-growing hospital network. Through these

---

[4] *Victor Bakkar: Filling Customers' Needs*, Repertoire, http://www.repertoiremag.com/ 5049.html (last visited Jan. 2, 2018).

misrepresentations, Bakkar attempted to claim that McKesson's mammoth sales of Huggies®

diapers and training pants to Clare Medical at acute-care hospital prices were entirely legitimate.

Bakkar even offered to provide the Kimberly-Clark representative with a list of the hospitals that

Clare Medical was purchasing on behalf of, but Bakkar never followed through with his offer.

That is not surprising: Clare Medical is not affiliated with any hospital network, and Bakkar's

assurances to the contrary were designed to perpetuate the unlawful sales and pricing scheme

that netted him, his company McKesson, and his customer Clare Medical, millions of dollars in

illicit profit.

**C.      McKesson Violates Kimberly-Clark's Chargeback Policy By Taking Manufacturer Rebates For The Huggies® Diapers And Training Pants That It Sold To Clare Medical, Even Though Kimberly-Clark Never Authorized Such Rebates.**

39.     Despite selling Huggies® diapers and training pants to Clare Medical at rock-

bottom prices, McKesson ensured that it would nonetheless profit from those sales by further

violating Kimberly-Clark's Chargeback Policy.

40.     The Chargeback Policy permits a distributor to request rebates from Kimberly-

Clark for sales of Kimberly-Clark products that the distributor makes to approved end users.

This Chargeback Policy thereby allows distributors to recoup differences in their acquisition

costs and selling prices, while also passing on the preferred pricing agreements that Kimberly-

Clark has in place for approved end users.  For example, when a distributor makes a sale of

Huggies® diapers and training pants to an approved hospital or healthcare provider, Kimberly-

Clark issues a rebate to the distributor that represents the discount that the end user is entitled to

receive under acute-care hospital pricing, thereby enabling the end user to access the preferred

pricing.

41.     Under the Chargeback Policy, distributors must submit to Kimberly-Clark chargeback claims that include detailed information about each transaction, including providing the name and shipping address of the end user, the quantity of product sold, the specific codes of products sold, the distributor's acquisition cost, and the approved price agreement authorized for that end user.  Chargebacks are valid only for end users that Kimberly-Clark has authorized. Kimberly-Clark verifies each chargeback claim and, if approved, issues a chargeback coupon that the distributor can use as a credit towards a future purchase that the distributor makes from Kimberly-Clark.

42.     The Chargeback Policy further states that unauthorized deductions—including rebates taken outside of a proper chargeback method or taken in advance of receiving a valid coupon number—constitute serious non-compliance, and permits Kimberly-Clark to bill back for all such unauthorized deductions, which must be repaid immediately:

> **Unauthorized Deductions**
> Unauthorized deductions constitute a serious non-compliance with Kimberly-Clark Professional's North American Chargeback Policy.  . . .
>
> Unauthorized deductions include:
> • Coupons taken outside proper chargeback method
> • Coupons taken without a valid coupon/settlement number
> • Coupons taken in advance of the distributor receiving a valid coupon/settlement number
> • Coupons taken in amounts disputed by KCP
> • Coupons taken without adequate support to validate deviated pricing as authorized on the claimed pricing agreement
>
> KCP reserves the right to bill back for all unauthorized deductions.  Unauthorized deductions must be repaid immediately.

43.     The Chargeback Policy further states that "**Submission of a chargeback claim is an acknowledgment of KCP Chargeback Policy.**"

44.     All of Kimberly-Clark's distributors are required to affirmatively accept the Chargeback Policy before being able to submit a chargeback claim.  A distributor accepts the Chargeback Policy by clicking an "Accept" button on the Customer Portal, as shown below:



45.     McKesson accepted the Chargeback Policy on or before September 8, 2015.

46.     From May 21 to November 12, 2016, McKesson submitted 28 chargeback claims based on its sales of Huggies® diapers and training pants to Clare Medical.  For each claim, McKesson represented that Clare Medical was eligible for acute-care hospital pricing, and that McKesson was therefore entitled to a chargeback coupon for its sales to Clare Medical.  But as described above, McKesson was not actually entitled to any chargeback coupon, since Clare Medical was not, and had never been, eligible for acute-care hospital pricing.

47.     Nor did McKesson confirm Clare Medical's eligibility for acute-care hospital prices with Kimberly-Clark before it sold millions of dollars' worth of product to Clare Medical.

Instead, McKesson blindly extended the deeply discounted acute-care hospital pricing to Clare Medical without so much as a single question asked.

48.     Moreover, for its sales to Clare Medical, McKesson deviated from its own practice and policy of verifying an end user's eligibility for acute-care hospital pricing *before* extending such preferred prices to an end user.  McKesson could have at any time easily verified the correct pricing eligibility for Clare Medical through the online Kimberly-Clark Customer Portal.  Alternately, McKesson could have directly asked Kimberly-Clark to confirm Clare Medical's correct pricing eligibility prior to making vast sales to Clare Medical, which was a procedure that McKesson undertook regularly for its other customers.

49.     Had McKesson complied with its own practice and policy, it never would have received approval from Kimberly-Clark to sell to Clare Medical at heavily discounted rates that are only available for acute care healthcare providers.

50.     But McKesson did not undertake any such efforts here, because doing so would have shut down the scheme that allowed it to sell 78,540 cases of Huggies® diapers and training pants to Clare Medical at below-market prices, and for McKesson to receive credits worth more than $2.2 million based on those sales.  As alleged herein, none of the Defendants—neither McKesson, Bakkar, nor Clare Medical—had any incentive to halt the illicit sale of Huggies® diapers and training pants.

51.     Each additional sale to Clare Medical resulted in increases to McKesson's bottom line.  From 2015 to 2016, McKesson posted impressive growth rates in its sale of Huggies® diaper and training pants products, including year-over-year growth rates of 227% and 823% in certain product categories.  On the Clare Medical sales alone, McKesson pocketed over $2.2 million from unauthorized rebates from Kimberly-Clark based on its sales at acute-care hospital

prices. But these impressive sales figures were a sham, propped up by its illicit sales to Clare Medical.

52. McKesson's sales to Clare Medical also personally benefited Bakkar. In addition to receiving sales commissions, Bakkar benefited from his Clare Medical sales by rising in the ranks and increasing his own reputation as a successful sales representative. For instance, in 2017, Mr. Bakkar was recognized for the first time with a prestigious award for excellence in distributor sales, aided in no small part based on the millions of dollars' worth of Huggies® diapers and training pants that he sold in wrongful transactions with Clare Medical.

53. And finally, Clare Medical profited from being able to access rock-bottom prices for its purchases of Huggies® diapers and training pants through McKesson. Clare Medical could then turn around and resell the tens of thousands of cases of diapers that it purchased at hyper-competitive prices—more than 60% lower than what its closest competitors could offer— and still turn a tidy profit.

**D.    McKesson Covers Its Tracks By Immediately Taking, And Keeping, Rebates On Its Sales To Clare Medical In Violation Of Kimberly-Clark's Chargeback Policy.**

54. Moreover, McKesson took *immediate* deductions against their Kimberly-Clark invoices *before* Kimberly-Clark reviewed or approved the chargeback claims, thereby pocketing the money from its unlawful sales to Clare Medical before Kimberly-Clark had opportunity to confront McKesson about those sales. McKesson's immediate taking of deductions was a direct violation of the Chargeback Policy, which only permitted distributors to take chargeback rebates *after* they had been approved by Kimberly-Clark.

55. By taking immediate deductions on their chargeback claims, McKesson ensured that it would be able to capitalize on its sales to Clare Medical before Kimberly-Clark had an opportunity to review the validity of those transactions, thus short-circuiting the checks and

balances built into the Chargeback Policy that McKesson promised Kimberly-Clark it would abide by. Indeed, when Kimberly-Clark denied McKesson's chargeback claims, it was already too late as McKesson had already given itself the benefit of those chargebacks.

56. Furthermore, even though Kimberly-Clark began denying McKesson's chargeback claims for Clare Medical within 60 days—from as early as July 2016—and alerted McKesson that the sales to Clare Medical were unauthorized, McKesson ignored Kimberly-Clark. Not only did McKesson continue to sell hundreds of thousands of diapers and training pants to Clare Medical for several more months, but McKesson also continued to take immediate deductions for its wrongful and unauthorized sales to Clare Medical.

**E.** **McKesson Refuses To Repay Kimberly-Clark The Bill Back Amount.**

57. Following a thorough internal investigation, on November 17, 2016, Kimberly-Clark demanded, via email, McKesson to pay back the more than $2.2 million that it had realized in chargeback coupons that were based on the unauthorized sales of Huggies® diapers and training pants to Clare Medical, all of which Kimberly-Clark had denied.

58. Kimberly-Clark further informed McKesson that as a result of McKesson's failure to comply with the Chargeback Policy, McKesson had incurred a bill back amount of $2,298,875.20, which represented the improper deductions that McKesson had taken for the Huggies® diaper products that it sold to Clare Medical from May 21, 2016 to November 12, 2016. To support this bill back calculation, Kimberly-Clark provided McKesson with a detailed, itemized invoice that listed the specific chargeback claims for which McKesson took improper deductions.

59.     McKesson has not disputed that the bill back amount of $2,298,875.20 correctly stated the amount of chargeback deductions that McKesson realized based on chargeback claims that Kimberly-Clark has ultimately rejected.

60.     Pursuant to the Chargeback Policy, the bill back amount was immediately payable to Kimberly-Clark.

61.     Nevertheless, McKesson refused, and continues to refuse, to repay Kimberly-Clark the bill back amount of $2,298,875.20, which remains due and outstanding to this day.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Breach of Contract—Diaper Resale Policy**
(Against Defendant McKesson)

62.     Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 61 above as if fully restated herein.

63.     The Terms and Conditions constitute an enforceable contract between Kimberly-Clark and McKesson.  Kimberly-Clark has performed all of its material obligations under the Terms and Conditions.

64.     Section XVII of the Terms and Conditions restricted McKesson's sale of Huggies® diapers and training pants "to hospitals and other health care providers using the product for direct patient care," and prohibited McKesson from selling Huggies® diapers and training pants to "any retailer or wholesaler for resale in the retail consumer market."

65.     McKesson sold Huggies® diapers and training pants to Clare Medical, even though Clare Medical is not a "hospital" or "health care provider" within the meaning of Section XVII of the Terms and Conditions.  To the contrary, Clare Medical is a "retailer" and

"wholesaler" of medical supplies, which the Terms and Conditions expressly forbid distributors from selling to.

66.    McKesson therefore breached its obligations under Section XVII of the Terms and Conditions when it sold Huggies® diapers and training pants to Clare Medical between May 21, 2016, and November 12, 2016.

67.    Kimberly-Clark has suffered a monetary loss as a result of McKesson's breach of its contractual obligation under Section XVII of the Terms and Conditions, including in the form of lost profits and other amounts to be proven at trial, which are no less than $2,298,875.20.

**SECOND CAUSE OF ACTION**
**Breach of Contract—Chargeback Policy**
(Against Defendant McKesson)

68.    Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 67 above as if fully restated herein.

69.    The Chargeback Policy constitutes an enforceable contract between Kimberly-Clark and McKesson.  Kimberly-Clark has performed all of its material obligations under the Chargeback Policy.

70.    The Chargeback Policy only authorizes distributors to submit chargeback claims pursuant to a pre-approved price agreement that Kimberly-Clark has authorized for the purchasing end user.

71.    Kimberly-Clark never authorized any price agreement for Clare Medical.

72.    McKesson nonetheless submitted chargeback claims for its sales to Clare Medical.

73. McKesson therefore breached its obligations under the Chargeback Policy by submitting chargeback claims based on sales it made to an end user, Clare Medical, for whom Kimberly-Clark never authorized a price agreement.

74. The Chargeback Policy also only authorizes distributors to take deductions based on chargeback coupons that have been approved by Kimberly-Clark.

75. McKesson took immediate deductions based on chargeback claims that had not yet been approved, and were ultimately denied, by Kimberly-Clark.

76. McKesson nevertheless kept the full value of these deductions, which exceeded $2,298,875.20, and is retaining them to this day.

77. McKesson therefore breached its obligations under the Chargeback Policy when it took immediate deductions based on chargeback claims that had not yet been approved by Kimberly-Clark, and that were not based on any valid price agreement for Clare Medical.

78. Kimberly-Clark has suffered monetary loss as a result of McKesson's breach of the Chargeback Policy, including in the form of lost profits and other amounts to be proven at trial, in an amount of not less than $2,298,875.20.

**THIRD CAUSE OF ACTION**
**Tortious Interference With Contract**
(Against Defendants Bakkar and Clare Medical)

79. Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 78 above as if fully restated herein.

80. The Terms and Conditions constitute an enforceable contract between Kimberly-Clark and McKesson.

81.     Defendants Bakkar and Clare Medical knew that McKesson was an authorized distributor of Kimberly-Clark products, and that an agreement governed the distributor arrangement between Kimberly-Clark and McKesson.

82.     In making sales to Clare Medical, Bakkar was acting in his own self-interest because, *inter alia*, Bakkar received sales commissions based on his sales to Clare Medical, and because such sales increased his professional reputation.

83.     Defendants Bakkar and Clare Medical intended that McKesson breach its obligations under the Terms and Conditions of the Kimberly-Clark distributor agreement by, *inter alia*, representing that Clare Medical was a healthcare provider that was purchasing Huggies® diapers and training pants for its own use, and that Clare Medical was entitled to receive special preferred pricing for those diapers and training pants, even though Kimberly-Clark had never granted a price authorization to Clare Medical.

84.     As a result of Bakkar and Clare Medical's representations about Clare Medical's business and eligibility to purchase Huggies® diapers and training pants at special preferred prices, McKesson breached its obligations under the Terms and Conditions.

85.     Kimberly-Clark has been harmed as a result of Bakkar and Clare Medical's conduct, including in the form of lost profits and other amounts to be proven at trial.

### FOURTH CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
(Against Defendant McKesson)

86.     Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 85 above as if fully restated herein.

87.     The Terms and Conditions and Chargeback Policy constitute enforceable contracts between Kimberly-Clark and McKesson.  These contracts contain an implied covenant of good faith and fair dealing.

88.     McKesson breached its implied covenant of good faith and fair dealing by selling Huggies® diapers and training pants to Clare Medical, even though it knew that as a reseller, Clare Medical was barred from purchasing Huggies® diapers and training pants.

89.     McKesson further breached its implied covenant of good faith and fair dealing by continuing to sell Huggies® diapers and training pants to Clare Medical, and taking immediate deductions thereupon, even after Kimberly-Clark informed McKesson that Clare Medical was not eligible for sales and McKesson was not permitted to take immediate chargebacks against such sales.

90.     Kimberly-Clark has been harmed as a result of McKesson's conduct, including in the form of lost profits and other amounts to be proven at trial.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
(Against Defendants McKesson, Bakkar, and Clare Medical)

91.     Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 90 above as if fully restated herein.

92.     McKesson, Bakkar, and Clare Medical benefited from McKesson's sales of Huggies® diapers and training pants to Clare Medical, including in the form of profits and sales commissions to McKesson and Bakkar, and profits to Clare Medical when it resold the diapers to its customers.

93.     These benefits to McKesson, Bakkar, and Clare Medical were conferred at Kimberly-Clark's expense.  Kimberly-Clark did not permit nor intend for McKesson to sell its

Huggies® diapers and training pants to Clare Medical.  By improperly selling Huggies® diapers and training pants to Clare Medical, Defendants deprived Kimberly-Clark of sales and profits it would have otherwise been entitled to, based on a legitimate first sale to a distributor at standard distributor list prices.

94.     It is unjust to permit McKesson, Bakkar, and Clare Medical to retain the benefits derived from sales of products for which they were not entitled to transact, and which were made in violation of Kimberly-Clark's distributor arrangements.

95.     Kimberly-Clark is entitled to full restitution of such benefits under the doctrine of unjust enrichment.

**SIXTH CAUSE OF ACTION**
**Account Stated**
(Against Defendant McKesson)

96.      Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 95 above as if fully restated herein.

97.     McKesson owes Kimberly-Clark a bill back in the amount of $2,298,875.20, which represents the chargeback rebates that McKesson applied to its Kimberly-Clark invoices, even though the chargeback claims which were ultimately rejected by Kimberly-Clark.

98.     Kimberly-Clark provided a statement of the balance owed to McKesson on November 17, 2016 and March 1, 2017.  This statement constituted an account stated for a sum certain.

99.     McKesson received the statement and did not object to Kimberly-Clark's calculation of the bill back amount, thereby implicitly agreeing that the bill back amount was the correct summation of the chargeback deductions that McKesson took based on chargeback claims that Kimberly-Clark ultimately denied.

100.    Additionally, as set forth in the Chargeback Policy, McKesson agreed to immediately repay the bill back amount to Kimberly-Clark.

101.    McKesson has not paid the amount owed under this account.

102.    Kimberly-Clark is therefore entitled to a money judgment against McKesson for an account stated in the amount of $2,298,875.20.

**SEVENTH CAUSE OF ACTION**
**Goods and Services Rendered**
(Against Defendant McKesson)

103.    Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 102 above as if fully restated herein.

104.    From May to November 2016, McKesson requested that Kimberly-Clark deliver Huggies® diapers and training pants to McKesson.

105.    Kimberly-Clark shipped the Huggies® diapers and training pants that McKesson requested.

106.    McKesson has not paid Kimberly-Clark for the full cost of the Huggies® diapers and training pants that it requested and received from Kimberly-Clark.  This is because McKesson took immediate deductions against its Kimberly-Clark invoices based on unapproved chargeback claims that Kimberly-Clark ultimately denied.

107.    By taking immediate deductions against its Kimberly-Clark invoices, McKesson did not pay the full amount due for the Huggies® diapers and training pants that it requested and received from Kimberly-Clark.

108.    Kimberly-Clark is therefore entitled to a money judgment against McKesson for goods and services rendered in the amount of $2,298,875.20, which represents the amount of

unpaid invoices for Huggies® diapers and training pants that Kimberly-Clark shipped to Clare Medical.

## EIGHTH CAUSE OF ACTION
**Fraud**
(Against Defendants McKesson and Bakkar)

109.    Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 108 above as if fully restated herein.

110.    Defendants McKesson and Bakkar made the following intentional misrepresentations regarding the validity of McKesson's sales of Huggies® diapers and training pants to Clare Medical, which they knew were false:

a.    McKesson represented to Kimberly Clark (including on McKesson's website) that its customers were healthcare providers who were purchasing products for their patients' own use, when it in fact knew that Clare Medical was not a healthcare provider, was not purchasing products for patient use, and instead was purchasing products at rock-bottom, unauthorized prices so that it could resell them at a profit;

b.    McKesson actively concealed the fact that its customer base included retailers and wholesalers who did not purchase medical supplies for their own use, but rather for resale purposes;

c.    For each chargeback claim that McKesson submitted to Kimberly-Clark, McKesson represented that Clare Medical was entitled to acute-care hospital pricing for Huggies® diapers and training pants that Kimberly-Clark had authorized for certain hospitals and healthcare providers, even though McKesson knew Clare Medical was not eligible for such pricing;

d.     On or around October 31, 2016, Bakkar told a Kimberly-Clark representative that Clare Medical was a purchaser for a hospital network, and not a reseller; and

e.     On or around November 2, 2016, Bakkar again told a Kimberly-Clark representative that Clare Medical was not a reseller, but in fact a purchaser for a hospital network that operated hospitals across the United States.

111.    McKesson and Bakkar made these misrepresentations with the intent to induce Kimberly-Clark to allow McKesson and Bakkar to maintain their ill-gotten profits from unlawful and unauthorized sales to Clare Medical.

112.    Kimberly-Clark reasonably relied on these misrepresentations when it agreed to sell Huggies® diapers and training pants through McKesson, and when McKesson realized the discounts associated with its chargeback claims, which were more than $2.2 million.

113.    Kimberly-Clark has been harmed as a result of McKesson and Bakkar's misrepresentations, including in the form of lost profits and other amounts to be proven at trial.

## NINTH CAUSE OF ACTION
### Negligent Misrepresentation
(Against Defendants McKesson and Bakkar)

114.    Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 113 above as if fully restated herein.

115.    Defendants McKesson and Bakkar made the following misrepresentations regarding the validity of McKesson's sales of Huggies® diapers and training pants to Clare Medical, for which they had no reasonable ground to believe were true:

a.     McKesson represented on its website that its customers were healthcare providers and that, by extension, Clare Medical was a healthcare provider;

b.      For each chargeback claim that McKesson submitted to Kimberly-Clark, McKesson represented that Clare Medical was entitled to acute-care hospital pricing for Huggies® diapers and training pants that Kimberly-Clark had authorized for certain hospitals, even though McKesson knew Clare Medical was not eligible for such pricing;

c.      On or around October 31, 2016, Bakkar told a Kimberly-Clark representative that Clare Medical was a purchaser for a hospital network, and not a reseller; and

d.      On or around November 2, 2016, Bakkar told a Kimberly-Clark representative that Clare Medical was not a seller, but in fact a purchaser for a hospital network that ran hospitals across the United States.

116.    McKesson and Bakkar made these misrepresentations with the intent to induce Kimberly-Clark into allowing McKesson to ship Huggies® diapers and training pants to Clare Medical.

117.    Kimberly-Clark reasonably relied on these misrepresentations when it agreed to sell Huggies® diapers and training pants to Clare Medical through McKesson, and when McKesson realized the discounts associated with its chargeback claims, which were more than $2.2 million.

118.    Kimberly-Clark has been harmed as a result of McKesson and Bakkar's misrepresentations, including in the form of lost profits and other amounts to be proven at trial.

### TENTH CAUSE OF ACTION
**Tortious Interference with Prospective Economic Advantage**
(Against Defendants McKesson, Bakkar, and Clare Medical)

119.    Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 118 above as if fully restated herein.

120.     At all relevant times, Kimberly-Clark has enjoyed beneficial economic relationships with its authorized distributors. Kimberly-Clark regularly sells its products, including Huggies® diapers and training pants, to authorized distributors who, in turn, sell those products to their own customers.

121.     As a result of these beneficial economic relationships, there was a reasonable probability that Kimberly-Clark would have sold Huggies® diapers and training pants to its authorized distributors at standard distributor list prices. Kimberly-Clark would have received profits from those sales.

122.     Defendants intentionally interfered with these beneficial economic relationships by depriving Kimberly-Clark of the opportunity to make legitimate first sales of its Huggies® diapers and training pants to its distributors at standard distributor list prices. In particular, by permitting Clare Medical to purchase, and then resell to its own customers, large amounts of Huggies® diapers and training pants, Defendants preempted the purchases of Huggies® diapers and training pants that those customers would have otherwise made, thereby reducing the overall demand for Huggies® diapers and training pants from Kimberly-Clark's legitimate distributors.

123.     Kimberly-Clark has been harmed as a result of Defendants' interference, including in the form of lost profits and other amounts to be proven at trial.

### ELEVENTH CAUSE OF ACTION
### Civil Conspiracy
(Against Defendants McKesson, Bakkar, and Clare Medical)

124.     Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 123 above as if fully restated herein.

125.     Defendants McKesson, Bakkar, and Clare Medical willfully and deliberately entered into an agreement to engage in unlawful activities, including:

a. Perpetrating fraud on Kimberly-Clark by making misrepresentations regarding the nature of Clare Medical's business and Clare Medical's eligibility for special preferred pricing on its purchases of Huggies® diapers and training pants; and

b. Tortiously interfering with Kimberly-Clark's prospective economic advantage by depriving Kimberly-Clark of legitimate first sales of its Huggies® diapers and training pants to distributors at standard distributor list prices.

126. As a result of Defendants' conspiracy, Kimberly-Clark has been harmed and is entitled to money damages in the form of lost profits and other amounts to be proven at trial.

**TWELFTH CAUSE OF ACTION**
**Alter Ego/Misuse of Corporate Form**
(Against Defendants Clare Medical and Toms)

127. Kimberly-Clark repeats the allegations contained in Paragraphs 1 through 126 above as if fully restated herein.

128. Upon information and belief, Toms exercised complete domination and control over Clare Medical. Upon information and belief, Toms directed Clare Medical's purchases of Huggies® diapers and training pants from McKesson.

129. Upon information and belief, Clare Medical acted as the alter ego or an instrumentality of Toms, and had no real legal independence or significance independent of Toms.

130. Upon information and belief, Toms used Clare Medical as a front to purchase Huggies® diapers and training pants at special preferred prices normally reserved for hospitals, thereby furthering his fraudulent and deceptive scheme of procuring products at below-market prices and reselling them for a profit.

131.     Kimberly-Clark is therefore entitled to a declaration that Toms and Clare Medical have abused the corporate form, and that Toms should be personally liable for the liabilities of Clare Medical.

## **PRAYER FOR RELIEF**

WHEREFORE, Kimberly-Clark respectfully requests that this Court enter judgment in Kimberly-Clark's favor and against Defendants, consisting of:

a.     Awarding Kimberly-Clark damages of at least $2,298,875.20 and any such additional damages to be determined at trial, plus interest;

b.     A declaration that Herbert A. Toms III is liable for any and all liabilities of Clare Medical, including the full amount of the judgment entered against Clare Medical;

c.     Awarding Kimberly-Clark punitive damages;

d.     Awarding Kimberly-Clark its costs, fees, and disbursements incurred in connection with these proceedings; and

e.     Other and further relief as this Court deems just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38, Kimberly-Clark requests a trial by jury on all issues so triable.

\\\

\\\

\\\

\\\

\\\

\\\

DATED:  January 2, 2018

Jeffrey S. Rosenberg (VA 85011)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone:  (202) 955.8500
Facsimile:  (202) 467.0539
JSRosenberg@gibsondunn.com

Timothy W. Loose (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  (213) 229.7000
Facsimile:  (213) 229.7520
TLoose@gibsondunn.com

Attorneys for Plaintiff
KIMBERLY-CLARK CORPORATION